**L.T. DES CHAMP, Appellant,**

v.

**Billy R. FEATHERSTON, Appellee.**

**No. 3–94–285–CV.**

Court of Appeals of Texas, Austin.

Oct. 26, 1994.

William H. Bingham, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for appellant.

Randall B. Wood, Doug W. Ray, Ray, Wood & Fine, Austin, for appellee.

Before ABOUSSIE, JONES and KIDD, JJ.

PER CURIAM.

Appellant L.T. Des Champ filed an election contest challenging the outcome of the runoff election held on April 12, 1994, for the Democratic nomination for County Judge of Llano County, Texas. The district court rendered judgment upholding the election and declaring appellee Billy R. Featherston the winner. We will affirm the trial-court judgment.

## BACKGROUND

This case involves the April 12, 1994, runoff election for the Democratic nomination for County Judge of Llano County between Des Champ and Featherston. The initial canvas of votes revealed that Des Champ won the election by two votes—929 to 927. Featherston then requested a recount, and the official election result after the recount showed that the election was tied 929 to 929. Pursuant to the mandate of the Election Code, the candidates drew lots. *See* Tex. Elec.Code Ann. § 2.028 (West 1986). Upon winning the draw, Featherston was declared the winner of the election.

Des Champ timely perfected a statutory election contest. Tex.Elec.Code Ann. §§ 232.001—.050 (West 1986 & Supp.1994). He alleged a number of election irregularities, including movement of a polling place in violation of the Texas Election Code and Section 5 of the Voting Rights Act of 1965, casting of illegal votes, and failure to secure the ballots cast in the runoff as required by the Election Code. Following a nonjury trial, the district court rendered judgment in favor of Featherston. The court found that Des Champ failed to prove that any of the alleged irregularities affected the outcome of the runoff election. It further determined that five people who had voted in the election, three of whom had voted for Des Champ and two for Featherston, were ineli-

gible to vote.[1] The court thus found the true outcome of the election to be 927 votes for Featherston and 926 votes for Des Champ.

## DISCUSSION

In his appeal, Des Champ raises three points of error. He claims that the trial court erred: (1) in upholding the result of the runoff election because the movement of a polling place on the election day rendered the entire election void; (2) in failing to consider Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, as a collateral matter in resolving the election contest; and (3) in upholding the outcome of the runoff election because numerous other irregularities rendered the true result of the election improbable or impossible to ascertain.

■ We begin by addressing Des Champ's first point of error, which compels us to determine whether the trial court erred in not ordering a new election because the movement of the polling place for precinct number three rendered the election void. The Democratic primary had long been held in the Volunteer Fire Department building (the "Volunteer building"), and the notices for the primary and the runoff election stated that each election would be held in that building. However, on the morning of the election, precinct chairman Harold Steadman moved the polling place from the Volunteer building to the nearby Red Barn Community Center (the "Red Barn"). Des Champ asserts that this change prevented some individuals from voting.

■ Election Code provisions fall into two categories: mandatory and directory. To set aside an election for a violation of a mandatory provision, the contestant must prove only that a violation occurred. With few exceptions, such a violation results in the automatic invalidation of the election. To set aside an election for a violation of a directory provision, however, the contestant must prove both that a violation occurred and that the irregularity affected the outcome of the election. *See Branaum v. Patrick*, 643 S.W.2d 745, 749–50 (Tex.App.—San Antonio 1982, no writ). Des Champ asserts that Election Code provisions governing the time and place of elections are mandatory and, consequently, any violation of these provisions automatically voids the election as a matter of law. The moving of the polling place for precinct three did violate the Election Code, as even Featherston concedes. *See* Tex.Elec.Code § 43.003 (West 1986). Our task is to determine whether provisions concerning the designation of a polling place are always mandatory and, further, to decide if the violation of the polling place provision in precinct three requires this Court to void the entire election.

Courts liberally construe Election Code provisions not clearly mandatory on their face as directory only. *Ramsay v. Wilhelm*, 52 S.W.2d 757, 759 (Tex.Civ.App.—Austin 1932, writ ref'd). However, "[p]rovisions regulating the time and place for holding elections are *usually* mandatory." *Davis v. State*, 75 Tex. 420, 12 S.W. 957, 961 (1889) (emphasis added); *see also Branaum*, 643 S.W.2d at 750 (stating in dicta that provisions setting the day and place of an election are usually mandatory); *Shrader v. Ritchey*, 306 S.W.2d 808, 809 (Tex.Civ.App.—Beaumont 1957) (declaring that place and time provisions are mandatory), *on certificate*, 158 Tex. 154, 309 S.W.2d 812 (1958); *Clark v. Stubbs*,

---

1. The court stated in its findings of fact:

 3. Five (5) persons voted in the election at issue who were ineligible to vote.

 4. The ineligible votes are as follows:

 a. Three (3) persons who voted in the election were ineligible because of disqualifying felony convictions.

 b. One (1) person who voted in the election was ineligible to vote because she had voted in the March 8, 1994, Republican primary election.

 c. One (1) person who voted in the election was ineligible to vote because he had been finally adjudged to be mentally incompetent.

 5. The three persons disqualified from voting because of felony convictions voted for Contestant Des Champs.

 6. The person disqualified for voting because of having voted in the Republican primary election voted for Contestee Featherston.

 7. The person disqualified from voting because of a final judgment of mental incompetency voted for Contestee Featherston.

 8. The testimony of the disqualified voters as to how they voted was credible.

 9. The true vote count in the election is as follows: Contestee Featherston—927, Contestant Des Chaps [sic]—926.

131 S.W.2d 663, 667 (Tex.Civ.App.—Austin 1939, no writ) (holding that "[t]he time and place for holding elections are usually regarded as mandatory"); *Coffee v. Lieb*, 107 S.W.2d 406, 410–11 (Tex.Civ.App.—Eastland 1937, no writ) (determining that place and notice provisions for special elections are mandatory); *Gray v. Ingleside Indep. Sch. Dist.*, 220 S.W. 350, 351 (Tex.Civ.App.—Fort Worth 1920, writ dism'd) (noting in dicta that place provisions are mandatory).

We therefore assume, without deciding the issue, that provisions governing the time and place for holding elections are mandatory. However, this assumption does not resolve the issue of whether a violation of such a provision requires a court to void the entire election. Courts have recognized that the policy behind time and place provisions dictates that violations should not always result in the voiding of an election. *See, e.g., May v. State*, 43 Tex.Crim. 54, 63 S.W. 132, 133 (Tex.Crim.App.1901); *Ex parte Segars*, 32 Tex.Crim. 553, 25 S.W. 26, 27 (Tex.Crim.App. 1894). Even Des Champ concedes that a violation of a mandatory provision should not always result in the voiding of an election, identifying three categories of exceptions in which time and place provisions are not mandatory: (1) the collateral attack exception, which disallows an attack on an election through any means other than an election contest; (2) the de minimus exception, which enables a court to uphold an election in spite of a minor move that does not affect the election outcome; and (3) the prescription exception, which allows the establishment of a new voting location by prescription. For present purposes, we need examine only the second exception.

The Texas Supreme Court has explained the policy underlying time and place provisions: "It is of the essence of a fair election that a time should be fixed and a place appointed where each qualified voter may cast his ballot or give his vote." *Davis*, 12 S.W. at 961. The Court of Criminal Appeals used a similar rationale to explain the de minimus exception:

> The object of a provision of this character is to insure a fair and honest election, by requiring each voter to cast his ballot at the same place where his neighbor voted, and those to whom his qualifications were best known and by whom, if necessary, they could be challenged.... Elections are the ultimate expression of the sovereign will. When fairly expressed,—that is, free from taint of fraud or charge of improper conduct,—*it becomes the duty of courts to sustain them, where it can be done by a liberal construction of the laws relating to elections, rather than defeat them by requiring rigid conformity to law.* The great public purposes which are accomplished by elections demand this.

*Ex parte White*, 33 Tex.Crim. 594, 28 S.W. 542, 544 (Tex.Crim.App.1894) (emphasis added). The court thus determined that a change in polling place across the hallway of the courthouse to another room was insufficient to void the election; the distance was very small, and voters knew where the poll was. *Id.* In a case decided the same year, the court determined that moving the poll to another street two blocks away did not represent sufficient grounds for voiding the election. The court held:

> It does not appear that there has not been a fair expression of the will of the people.... It does not appear that any voter was deprived of his vote, nor was the change attributed to any fraudulent or improper motive, nor does it appear that the change was not known and concurred in by all the voters in ward 2. Indeed, ... we find that a larger proportionate vote was cast in ward 2 than in the other wards....

*Ex parte Segars*, 25 S.W. at 27; *see also May*, 63 S.W. at 133 (recognizing an exception to the general rule that place provisions are mandatory when changes in location are only slight and "were rendered necessary by some supervening cause"); *Roper v. Scurlock*, 29 Tex.Civ.App. 464, 69 S.W. 456, 458 (Tex.Civ.App.1902) (deciding that a changed polling place only 125 feet and within plain view of the designated polling place was not grounds for voiding the election), *appeal dismissed*, 193 U.S. 675, 24 S.Ct. 852, 48 L.Ed. 842 (1904).

We will proceed to consider whether the precinct three move falls within the de minimus exception. The polling place was moved

across a parking lot from the Volunteer building to the Red Barn, a location in plain view of the designated polling place. Testimony established that at least one sign directed people to the new polling site. Des Champ argues that people were confused and did not vote because of the move. He complains that instead of using the door to the Red Barn located directly across from the Volunteer building and readily visible from that building, Steadman used a back entrance that could not be seen from the Volunteer building and that opened into a barbecue pit area. However, the uncontroverted facts confirm that not a single voter was actually prevented from voting.[2] In fact, the evidence establishes that the turnout in precinct three was higher than all but one other precinct, and almost twenty percent higher than the precinct three turnout had been in the primary election. Des Champ suggests that Steadman moved the polling place because he was a friend and supporter of Featherston. Steadman testified at his deposition that he was not an active supporter of either runoff candidate; while he had signed and distributed petitions for Featherston, he also signed a letter for Des Champ and authorized him to include the letter in a campaign brochure. When asked why he moved the polling location to the Red Barn, Steadman explained that the Republicans ordinarily used the Red Barn during primary elections, and it was therefore usually unavailable for Democratic primaries. Because the facility proved available the morning of the runoff

election, he decided to move the polling place to the larger, more comfortable location across the parking lot.[3] We conclude that the change in the polling location of precinct three, though a technical violation of the Election Code, was a de minimus change. Under these circumstances, it would frustrate the democratic process to void this entire runoff election for the sake of rigid conformity to the law. Therefore, we overrule Des Champ's first point of error.

The result would be the same if we concluded that the Election Code provision at issue was merely directory. The trial court determined in its findings of fact and conclusions of law that "there is no credible evidence that any voters were denied the right to vote by the moving of the polling place in voting Precinct Number 3."[4] We attach to findings of fact the same weight that we attach to a jury's verdict upon jury questions. *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Accordingly, findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards used to review jury findings. *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex.Civ. App.—Dallas 1981, writ ref'd n.r.e.) (citing *Hall v. Villarreal Dev. Corp.*, 522 S.W.2d 195 (Tex.1975)).[5] When a court's findings of fact go unchallenged, such findings become undisputed facts binding on all parties. *James Holmes Enter., Inc. v. John Bankston*

2. In its undisputed findings of fact, the court determined that "[t]here is no credible evidence that any voters were denied their right to vote by the moving of the polling place in voting Precinct Number 3" and that the irregularities alleged by Des Champ did not affect the outcome of the election.

3. Steadman also testified that precinct three is in fact Featherston's home box and that Featherston had done well during the primary election in that box. This suggests that even if Steadman were a friend or supporter of Featherston, he would have little incentive for making it more difficult for voters in precinct three to cast their ballots.

4. The trial court misidentified some of its findings of fact as conclusions of law. However, the trial court's designation is not controlling on appeal. Although a finding appears among con-

clusions of law, the appellate court may treat it as a finding of fact. *Ray v. Farmers State Bank*, 576 S.W.2d 607, 608 (Tex.1979); *Posner v. Dallas County Child Welfare Unit*, 784 S.W.2d 585, 587 (Tex.App.—Eastland 1990, writ denied). Conclusions of law numbers 10 through 17 are actually findings of fact.

5. When reviewing the factual sufficiency of the evidence to support the finding of the trier of fact, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *see also Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986). *See generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515 (1991).

*Constr. & Equip. Rental, Inc.,* 664 S.W.2d 832, 834 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.); *see also* Tex.R.Civ.P. 298. In the present case, the findings of fact are unchallenged and are, therefore, taken as true. Because Des Champ failed to prove that the violation affected the outcome of the election, he failed to meet his burden of proof necessary for voiding the election.

 In his second point of error, Des Champ asserts that the trial court erred in failing to consider Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1994), as a collateral matter in determining the outcome of the election contest. He complains that Steadman, a precinct chairman, moved the precinct three polling place in contravention of the Texas Election Code and without preclearance from the United States Attorney General and that the chairman of the Llano County Democratic Party, Roger Pinckney, moved the precinct eight polling place without preclearance. Section 5 of the Act mandates that when a political subdivision covered by the Act enacts or administers a new voting procedure, the political subdivision must either seek a declaratory judgment in the United States District Court in the District of Columbia or submit the procedure to the United States Attorney General for preclearance. 42 U.S.C. § 1973c.

However, the "approval requirements of Section 5 apply only when a 'state or political subdivision shall enact or seek to administer' a change in its voting procedures." *United States v. Saint Landry Parish Sch. Bd.,* 601 F.2d 859, 863–64 (5th Cir.1979) (quoting 42 U.S.C. § 1973c). The Fifth Circuit decided in *Saint Landry Parish* that while the isolated actions of three poll commissioners in a vote-buying scheme could be viewed as a change in voting procedures covered by Section 5, such actions did not constitute a change that the state "has enacted or sought to administer" within the scope of the Act's approval provision. *Id.* at 864. The court explained:

We do not dispute that the actions of the three poll commissioners constitute actions of the state for certain purposes.... But one would not normally conclude that a state "enacts or administers" a new voting procedure every time a state official deviates from the state's required procedures. The commonsense meaning of "shall enact" indicates that action of a state, *as a body,* is envisioned, and we think "shall seek to ... administer" was added to cover situations when an enactment was not actually passed, but when a procedure was nonetheless widely administered with at least the implicit approval of the state governing authority.

. . . .

... Surely Congress did not intend the Attorney General and the district court for the District of Columbia to waste their time considering voting procedures that a state does not wish to enact or administer. But this would be the result if we required the state to submit for approval, as a new voting procedure, those actions of state officials which conflict with the state's required procedures.

*Id.* (emphasis in original). The court further instructed that Section 5 was "not designed to provide sanction for every fraudulent election.... [It] does not operate to discover and uncover every artifact of political manipulation.... [It] does not possess a universality with respect to every electoral aberration." *Id.* at 865.

 We thus dispose of Des Champ's second point of error without deciding the proper role for state courts in the enforcement of the Voting Rights Act. The actions of neither Steadman nor Pinckney constituted a procedure whereby the state enacted or administered a new voting procedure. Their actions, instead, like the action of the three commissioners in *Saint Landry Parish,* represent a deviation from the state's required procedures *by individuals.*[6] Accordingly,

6. Even if we had determined that Pinckney's actions constituted a procedure whereby the state enacts or administers a new voting procedure, we would still overrule Des Champ's second point of error with regard to precinct eight. While it is unclear from the record, it appears that the polling location for precinct eight was used for *both* the primary and runoff elections without preclearance. However, Des Champ did not assert a Section 5 violation after the primary election on the grounds that the location was not precleared, and thus should be estopped from

Section 5 does not apply, and the trial court was correct in not considering Des Champ's Section 5 claims. We overrule Des Champ's second point of error.

In his final point of error, Des Champ contends that the trial court erred in upholding the runoff election because numerous other irregularities rendered the true result impossible or improbable to ascertain. Des Champ has asserted a number of complaints: discrepancies in ballot tabulations of the total runoff votes cast; the failure to give the ballot-box keys to the Llano County Sheriff as required by law and the placing of the keys in a drawer near the ballot box; the retention of unused extra ballots in the County Clerk's office; the County Clerk's failure to account for the number of ballots available for use during the runoff; the failure of the election judge for precinct three to count the ballots he received; the absence of a paper seal over the ballot-box slot when the box was brought in for the recount and the appearance of tampering; and the attempts by Llano County officials to influence the election outcome.

These violations implicate directory provisions of the Election Code. Mandatory provisions are generally limited to provisions requiring elections to be held by ballot and to those setting out voter qualifications as well as the time and place of elections. To set aside an election for violation of directory provisions, the contestant must show that the irregularities prevented voters from exercising freely and fairly their right to vote or from having their votes properly counted; in the absence of such proof, such irregularities are treated as informalities that do not void the election. *See Branaum,* 643 S.W.2d at 750; *Shrader,* 306 S.W.2d at 809–10; *see also Chumney v. Craig,* 805 S.W.2d 864, 870 (Tex.App.—Waco 1991, writ denied) (holding that the contestant has the burden of proving that the outcome of the election was not the true outcome because of alleged irregularities); *Ware v. Crystal City Indep. Sch. Dist.,* 489 S.W.2d 190, 191–92 (Tex.Civ. App.—San Antonio 1972, writ dism'd) ("The

burden is on the contestant to allege and prove either a different result would have been reached by counting or not counting specified votes, or that irregularities ... were such as to render it impossible to determine the will of the majority of the voters participating.").

According to the unchallenged findings of fact, which must be taken as true, Des Champ failed to meet his burden of proof. The trial court, instead, found that "the irregularities alleged by Contestant Des Champ to have occurred in the election process, singularly or in the aggregate, did not affect the outcome of the election." Among its findings of fact, the court determined that "there is no credible evidence that handling of the ballot boxes or the keys to the ballot boxes by the County Clerk had any effect on the outcome of the election." The court also concluded that "there is no credible evidence that there was a miscount or mistake in the count because of the conduct of the election officials in the election" or that "any voters were intimidated into not voting or voting for a person other than their choice." Thus, the outcome of the election was not improbable or impossible to ascertain. Instead, the court determined in its findings of fact that the true vote of the election was 927 to 926 for Featherston after discarding ineligible votes. We overrule Des Champ's third point of error.

## CONCLUSION

We overrule appellant Des Champ's points of error and affirm the trial court's judgment.

making the objection after the runoff election. Additionally, the undisputed findings of fact establish that "[t]here is no credible evidence that

the change in polling places in voting Precinct Number 8 had any effect in the outcome of the election."