

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00007-CV

_____

NISSAN NORTH AMERICA, INC., Appellant

V.

TEXAS DEPARTMENT OF MOTOR VEHICLES, ET AL., Appellees

On Appeal from the 126th District Court
Travis County, Texas
Trial Court No. D-1-GN-17-004072

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

Nissan North America, Inc., sought to terminate its 1989 Dealer Sales and Service Agreement (Agreement) with Bates Nissan due to Bates' poor sales performance and violation of accepted accounting practices. After an administrative hearing, the Board of the Texas Department of Motor Vehicles[1] adopted the administrative law judge's proposal for decision, finding that Nissan failed to establish good cause to terminate the agreement. The 126th Judicial District Court of Travis County affirmed the Board's order.[2]

On appeal, Nissan contends that (1) the Board erred in concluding that Bates' sales performance did not amount to a breach of the Agreement, (2) the Board erred in concluding that Bates did not breach the Agreement by willfully falsifying its tax returns and by knowingly submitting false financial statements to Nissan, and (3) the Board erred by considering evidence of the dealer's performance after Nissan issued its notice of termination. We affirm the trial court's ruling.[3]

## I. Statutory Structure and Procedure

The TDMV has the exclusive statutory authority to regulate franchise relationships between dealers and motor vehicle manufacturers, including manufacturers of motor homes. *See* TEX. OCC. CODE ANN. §§ 2301.001–2401.253 (Supp.). Under the Texas Occupations Code, a

---

[1]Because the Board is the governing body of the Texas Department of Motor Vehicles (TDMV), we use the term Board to reference the TDMV. *See* TEX. OCC. CODE ANN. §§ 2301.002(2), 2301.005(a).

[2]The Honorable Jan Soifer was assigned to preside over the 126th Judicial District Court for the case.

[3]Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between the precedent of the Third Court of Appeals and this Court on any relevant issue. *See* TEX. R APP. P. 41.3.

franchise is one or more contracts between a motor vehicle manufacturer and a dealer setting out their relationship and obligations, including the right of the dealer to sell and service motor vehicles and any duty or obligation granted or imposed by the Texas Occupations Code. TEX. OCC. CODE ANN. § 2301.002(15). One of the primary goals of the provisions of the occupations code is to "ensure a sound system of distributing and selling motor vehicles" in our state. TEX. OCC. CODE ANN. § 2301.001. To accomplish this goal, the Code authorizes the Board to

> (1) administer this chapter [of the Occupations Code]; . . . (3) ensure that the distribution, sale, and lease of motor vehicles is conducted as required by [the Occupations Code] and [B]oard rules; . . . and (5) prevent fraud, unfair practices, discrimination, impositions, and other abuses in connection with the distribution and sale of motor vehicles.

TEX. OCC. CODE ANN. § 2301.152(a); *see also Subaru of Am., Inc. v. David McDavid Nissan*, 84 S.W.3d 212, 224 (Tex. 2002).[4]

Once a manufacturer and dealer have entered into a franchise agreement, certain requirements must be met for an automobile manufacturer to terminate the agreement. TEX. OCC. CODE ANN. § 2301.453. First, the manufacturer must give timely written notice to the Board and to the dealer before the proposed termination date that sets out the specific reasons for the termination and contains a conspicuous statement on the first page notifying the dealer of its right to protest the termination and have a hearing. TEX. OCC. CODE ANN. § 2301.453(c)–(d). If, after receiving the notice, the dealer does not file a protest, the franchise agreement will be terminated after notice of termination if the dealer consents in writing or the time to file a protest has expired.

---

[4]The *Subaru* decision was decided before the predecessor to the Occupations Code, the Texas Motor Vehicle Commission Code, was codified. *See* TEX. REV. CIV. STAT. art. 4413(36).

TEX. OCC. CODE ANN. § 2301.453(a). If the dealer files a protest within the required time, a statutory stay is entered, preventing the parties from committing any act or omission that would affect a legal right, duty, or privilege of any party before the Board, and the Board schedules a hearing in which the manufacturer must demonstrate good cause for the termination by a preponderance of the evidence. TEX. OCC. CODE ANN. §§ 2301.453(e), (g), 2301.803.

All contested hearings "must be held by an administrative law judge of the State Office of Administrative Hearings" (ALJ). TEX. OCC. CODE ANN. § 2301.704(a). In conducting the hearing, the ALJ acts with "all the board's power and authority," including the power to "make findings of fact and conclusions of law" and "issue a proposal for decision and recommend a final order." TEX. OCC. CODE ANN. § 2301.704(b)(7)–(8). In making its final decision, the Board reviews the ALJ's proposal for decision, findings of fact and conclusions of law, recommended order, as well as any exceptions and replies to the same filed by the parties, and issues a final order. TEX. OCC. CODE ANN. § 2301.709–.711.

In determining whether good cause has been established, the Board shall consider "all existing circumstances," including the following seven factors:

(1)     the dealer's sales in relation to the sales in the market;
(2)     the dealer's investment and obligations;
(3)     injury or benefit to the public;
(4)     the adequacy of the dealer's service facilities, equipment, parts, and personnel in relation to those of other dealers of new motor vehicles of the same line-make;
(5)     whether warranties are being honored by the dealer;
(6)     the parties' compliance with the franchise, except to the extent that the franchise conflicts with this chapter; and
(7)     the enforceability of the franchise from a public policy standpoint, including issues of the reasonableness of the franchise's terms, oppression, adhesion, and the parties' relative bargaining power.

4

TEX. OCC. CODE ANN. § 2301.455(a)(1)–(7). A manufacturer's desire for market penetration, alone, does not constitute good cause. TEX. OCC. CODE ANN. § 2301.455(b). The Board has exclusive discretion to determine the weight of the evidence for each factor and to determine whether the petitioner has shown good cause. TEX. GOV'T CODE ANN. § 2001.174; *Austin Chevrolet, Inc. v. Motor Vehicle Bd. & Motor Vehicle Div. of Tex. Dep't of Transp.*, 212 S.W.3d 425, 432 (Tex. App.—Austin 2006, pet. denied).

A party may seek judicial review of the Board's final order. TEX. OCC. CODE. ANN. § 2301.751(a). Judicial review is performed under the substantial evidence standard where the court presumes that the Board's order is supported by substantial evidence, and the appellant has the burden of overcoming this presumption. S*ee* TEX. GOV'T CODE ANN. §§ 2001.171, 2001.174; *Austin Chevrolet, Inc.*, 212 S.W.3d at 430–31. Under this standard of review, the court cannot substitute its judgment on the weight of the evidence for that of the Board. TEX. GOV'T CODE ANN. § 2001.174.

The court is not bound by the reasons stated in the Board's order. *Tex. Health Facilities Comm'n v. Charter Medical-Dallas*, 665 S.W.2d 446, 452 (Tex. 1984). The test is not whether the Board reached the correct conclusion, but whether some reasonable basis exists in the record for the Board's decision. *Tex. Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 244 (Tex. App.—Austin 1997, no writ) (citing *Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984)). An order may not be set aside "merely because testimony was conflicting or disputed or because it did not compel the same factual conclusion made by the agency." *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.

5

1984).  The evidence in the record may even preponderate against the Board's decision, but the reviewing court must uphold the Board's decision if there is more than a scintilla of evidence to support the final order.  *Charter Med.-Dallas, Inc.*, 665 S.W.2d at 452.

"[O]n questions of law, neither the trial court nor the administrative law judge is entitled to deference on appeal."  *Tex. Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006).  Even under the substantial evidence standard, questions of law are reviewed de novo.  *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999); *Nobles v. Emps. Ret. Sys. of Tex.*, 53 S.W.3d 483, 490 (Tex. App.—Austin 2001, no pet.).  In a de novo review, the reviewing court conducts a review of the record to make its own legal determinations and conclusions.  *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

Section 2001.174 of the Texas Government Code states, in relevant part, that a reviewing court

> shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions, are:
>
> (A)     in violation of a constitutional or statutory provision;
> (B)     in excess of the agency's statutory authority;
> (C)     made through unlawful procedure;
> (D)     affected by other error of law;
> (E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*See* TEX. GOV'T CODE ANN. § 2001.174(2).

It is not clear from the code or caselaw when the Board's error affects a party's substantial rights.  TEX. GOV'T CODE ANN. § 2001.003; *see R.R. Comm'n v. Rio Grande Valley Gas Co.*, 683

S.W.2d 783, 789 (Tex. App.—Austin 1984, no writ). An administrative decision is generally not arbitrary and capricious if it is supported by substantial evidence. *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966). However, even if the Board's action is supported by substantial evidence, it can still be arbitrary and capricious and require reversal or remand "when a denial of due process has resulted in the prejudice of substantial rights of a litigant." *Charter Med.-Dallas, Inc.*, 665 S.W.2d at 454. A court may reverse and remand the Board's decision if it appears that improperly excluded evidence affected the result. *Lewis v. Metro. Sav. & Loan Ass'n*, 550 S.W.2d 11, 14–16 (Tex. 1977).

Nevertheless, an error is not prejudicial if a remand would amount to "nothing more than 'a postponement of the inevitable.'" *Id.* at 15 (quoting 1 Frank Edward Cooper, *State Administrative Law*, at 403–04 (1965)). This results-focused standard parallels that of Rule 44.1(a) of the Texas Rules of Appellate Procedure, which states, "No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a).[5]

---

[5]In *Texas Department of Public Safety v. Alford*, the dissent argued that "[i]n order to establish prejudice to substantial rights in an administrative order, a 'party must establish that in the court of appeals the error materially affected the agency result or impacted a material issue in the order, and therefore was reasonably calculated to cause and probably did cause the rendition of an improper order.'" *Tex. Dep't of Pub. Safety v. Alford*, 154 S.W.3d 133, 146 (Tex. App.—Waco 2004, pet. granted) (Gray, C.J., dissenting) (citing 1 Ronald L. Beal, *Texas Administrative Practice & Procedure* § 9.3.2, at 9–34 (June 2004) (ALJ's citation of incorrect Texas Transportation Code section number did not show prejudice)); *see also Tex. Dep't of Pub. Safety v. Jennings*, 1 S.W.3d 348, 352 (Tex. App.—Corpus Christi 1999, no pet.); *Tex. Dep't of Pub. Safety v. Nordin*, 971 S.W.2d 90, 95–96) (Tex. App.—Houston [14th Dist.] 1998, no pet.); *see generally* TEX. R. APP. P. 44.1(a)(1). The Texas Supreme Court reversed the majority's decision in *Alford* but did not specifically cite Justice Gray's dissent in its opinion. *See Alford*, 209 S.W.3d at 103–04.

## II. Factual Background

### A. Procedural History

Bates Nissan is the only franchised Nissan dealer in the greater area of Killeen, Texas. Bates has been a franchised dealer for Nissan and its predecessor for more than forty years. At the time of this case, Bates and Nissan were operating under the Agreement and its subsequently incorporated amendments and addendums.

In July 2010, Nissan issued a notice of default stating that Bates had failed to meet its sales obligation under the Agreement. In order to give Bates an opportunity to improve its sales performance, Nissan granted Bates several extensions over the next three years. When Bates' sales performance did not improve to Nissan's satisfaction, Nissan issued a notice of termination to Bates on December 23, 2013, informing Bates that Nissan intended to terminate Bates' franchise because, under Nissan's Regional Sales Effectiveness (RSE) metric, Bates had breached the Agreement by failing to meet its sales obligations. A year later, Nissan issued a supplemental notice of termination alleging an additional ground that Bates had also willingly falsified its tax returns to the Internal Revenue Service (IRS) and knowingly submitting false financial statements to Nissan. In response, Bates filed protests with the Board.

Bates' protests were consolidated, and the Board referred the matter to the State Office of Administrative Hearings (SOAH) for a contested hearing. The matter was heard before Administrative Law Judge Craig R. Bennett in Austin, Texas. The administrative hearing concluded on September 24, 2015, and the record was closed on February 8, 2016. The ALJ issued a proposal for decision that recommended that Nissan's petition for termination be denied because

8

it had failed to establish good cause for termination. The proposal included an overview of the statutory framework, a discussion of the relevant facts established by the testimony and exhibits presented at the hearing, and an analysis of the seven statutory good-cause factors for the termination of a franchise agreement. The ALJ found that the first three good-cause factors weighed against termination and that the fourth, fifth, sixth, and seventh factors were neutral. Based on that information and analysis, the ALJ made 125 findings of fact and fourteen conclusions of law.

The Board considered the ALJ's proposal for decision, Nissan's exceptions to the proposal, Bates' response to the exceptions, and the ALJ's letter in response to the exceptions. The Board issued a final order on June 1, 2017, adopting the ALJ's findings of fact and conclusions of law, granting Bates' protests, and denying Nissan's proposed termination. After Nissan's motion for rehearing was denied, it petitioned for judicial review. The 126th Judicial District Court of Travis County affirmed the Board's final order.

### B. Issues on Appeal

On appeal, Nissan raises three points of error challenging only the sixth good-cause factor, "the parties' compliance with the franchise" agreement. TEX. OCC. CODE ANN. § 2301.455(a)(6). Specifically, Nissan contends that under Section 2001.174(2)(D), its substantial rights were prejudiced because the Board's findings and/or conclusions were affected by the Board's errors of law (1) in concluding that Bates' sales performance did not breach the Agreement, (2) in concluding that Bates' accounting practices did not breach the Agreement, and (3) in considering Bates' sales performance from the time period after Nissan issued its notices of termination. *See*

9

TEX. GOV'T CODE ANN. § 2001.174(2)(D). Nissan does not challenge the Board's findings of fact or the remaining good-cause factors.[6]

### III.     Did the Board Err in Concluding that Bates' Sales Performance Did Not Breach the Dealer Agreement?

In its first point of error, Nissan contends that the Board erred as a matter of law in finding that Bates did not fail to fulfill its sales obligations under the Agreement. Specifically, Nissan argues that the Board erred by failing to use RSE to measure Bates' compliance with its contractual sales obligations under the Agreement.

#### A.     Bates' Obligations Under the Agreement

##### 1.     The Contract's Terms

Section 12.B.1 of the Agreement allows Nissan to terminate "[i]f, based upon evaluations thereof made by [Nissan], Dealer shall fail to substantially fulfill its responsibilities with respect to:  a. Sales of New Nissan Vehicles and the other responsibilities set forth in Section 3 of this Agreement." Section 3 governs the dealer's sales responsibilities. Section 3.A, entitled "General Obligations of Dealer," provides:

> Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail (and if Dealer elect, the leasing and rental) of Nissan Vehicles to customers located within Dealer's Primary Market Area. Dealer's Primary Market Area is a geographic area which Seller uses as a tool to evaluate Dealer's performance of its sales obligations hereunder.

---

[6]Bates argues that the entire appeal is moot because Nissan waived any challenge to the Board's findings of fact, including findings #101, that Bates' sales within its primary market area weighed against termination, and #124, that Bates did not breach the Agreement, and therefore, those findings "will remain in support of the Board's no good cause determination regardless of whether the Board misinterpreted the franchise and/or statute." However, here, as it did at the district court, Nissan is arguing that the Board made several errors of law (i.e., Bates did not breach the Agreement) that affected the Board's findings and/or conclusions under Section 2001.174(2)(D) of the Texas Government Code. *See* TEX. GOV'T CODE ANN. § 2001.174(2)(D). Therefore, the points raised were preserved.

Section 3.B provides that a "Dealer's performance of its sales responsibility . . . will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time." Section 3.B then gives four examples of "reasonable criteria":

3.B.1. Achievement of reasonable sales objectives which may be established from time to time by Seller for Dealer as standards for performance;

3.B.2. Dealer's sales of Nissan Cars and Nissan Trucks in Dealer's Primary Market Area and/or the metropolitan area in which Dealer is located, as applicable, or Dealer's sales as a percentage of:

3.B.2.(i)     registrations of Nissan Cars and Nissan Trucks;

3.B.2.(ii)    registrations of Competitive Vehicles;

3.B.2.(iii)   registrations of Industry Cars;

3.B.2.(iv)    registrations of vehicles in the Competitive Truck Segment;

3.B.3. A comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located and, where Section 3.C applies, for all other Authorized Nissan Dealers combined in the metropolitan area in which Dealer is located; and

3.B.4. A comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors.

The sales and registration data referred to in this Section 3 shall be those utilized in Seller's records or in reports furnished to Seller by independent sources selected by it and generally available for such purpose in the automotive industry. If such reports of registration and/or sales are not generally available, Seller may rely on such other registration and/or sales data as can be reasonably obtained by Seller.

11

## 2. Summary of Agreement Terms

Section 3.A of the Agreement does not directly require Bates to sell cars. Instead, it requires Bates to "actively and effectively ***promote*** . . . the sale at retail . . . of Nissan Vehicles to customers located within [Bates'] Primary Market Area" "through its own advertising and sales promotion activities." Logically, however, effective sales promotions should result in sales. And Section 3.B is entitled "Sales of Nissan Cars and Nissan Trucks." Therefore, while Section 3.A does not directly require Bates to sell cars, Section 3.B assumes that cars will be sold as a result of Bates' "advertising and sales promotions." Accordingly, Sections 3.A and 3.B together indirectly require Bates to sell Nissan vehicles.

Yet, nowhere in the Agreement is there any specific number or percentage of sales that Bates is obligated to achieve.[7] Rather, Section 3.B merely provides that Nissan will evaluate "[Bates'] performance of its sales responsibility . . . on the basis of reasonable criteria as [Nissan] may develop from time to time." Although it provides examples of "reasonable criteria," Section 3.B leaves room for the existence of other reasonable criteria not named therein.

RSE is not listed as an example in Section 3.B. Nevertheless, Nissan argues that it could use RSE to evaluate Bates' sales performance because RSE is a "reasonable criteria" under the agreement. Consequently, Nissan argues that the Board erred by failing to use RSE to evaluate

---

[7]The Agreement in this case consists of a four-page document entitled "Nissan Dealer Sales & Service Agreement" and a thirty-four-page document entitled "Nissan Dealer Sales And Service Agreement Standard Provisions" that is incorporated into the four-page agreement by reference. Both documents specify that Bates' responsibility as a dealer is to "actively and effectively promot[e] the sale at retail . . . of Nissan Vehicles within the Dealer's Primary Market Area." Nowhere in either document is there any express requirement that Bates sell a specific number or percentage of automobiles.

12

Bates' compliance with the agreement.   To understand Nissan's position and the Board's ruling, it is necessary to discuss how RSE is calculated and how Bates performed under that metric.

### B.      Regional Sales Effectiveness (RSE)

RSE[8] is a ratio of the regional[9] Nissan's dealers' average sales penetration and the expected number of Nissan registrations in the dealer's primary market area (PMA).[10]   Determining a dealer's RSE is a multi-step process.[11]

### 1.      Calculation of RSE

The first step in determining RSE is to determine the regional sales penetration, also referred to as the regional sales average, of Nissan dealers within the region. Penetration is a measure of the total number of sales by Nissan dealers within a particular vehicle segment (small cars, light trucks, etc.) in the region as a percentage of the total number of competitive sales within that same vehicle segment in the region.[12]  For example, if Nissan dealers are obtaining 15% of all competitive sales within the region, then l5% is the target "sales penetration" factor of the RSE equation.

---

[8]Nissan "used RSE for decades to evaluate the sales performance of all its dealers.  [Nissan] has subsequently stopped using RSE, and now uses a different metric."

[9]Bates is within Nissan's Central Region, which includes fourteen states.

[10]A dealer's PMA is the geographic area in the immediate vicinity of the dealership, where the dealer is "considered to have a competitive advantage over all other Nissan dealers solely because of location."  However, dealers were free to make sales anywhere in the country because PMAs are not market restrictions.

[11]For example, if the RSE expectation for a dealer is 1,000 new vehicle sales and the dealer sells l,000 vehicles, then it will be at 100% of RSE because the dealer is capturing the exact amount of sales it is expected to capture based on the region average.

[12]Competitive sales include the total sales of all manufacturer's vehicles in the region, not just the sales of Nissan vehicles.

Next, a Nissan dealer's expected sales are determined by taking the total number of competitive sales in each vehicle segment in the dealer's PMA and multiplying that number by the sales penetration factor (regional sales average) for that same vehicle segment by month. This process is repeated for each of the twelve months in the reporting period and totaled to arrive at the number of Nissan sales necessary to achieve the regional average. Accordingly, continuing the example above, if the dealer's PMA yields a total of 1,000 competitive sales in a given time period, the dealer would be expected to capture 15% of those sales, or 150 vehicles.

In the third step of determining RSE, a dealer's total sales in that segment, regardless of whether they were registered inside or outside of the dealer's PMA, are compared to the number of expected sales for that segment in order to reach the dealer's RSE score. For example, if the dealer sold l50 vehicles, then its RSE score would be 100%. An RSE score of 100% means that the dealer performed at the level of an average dealer in that region. Although not specified in the dealer agreement, Nissan "required its dealers to achieve 100% RSE on a rolling twelve-month basis to comply with the Sales Obligation pursuant to Section 3 of the Dealer Agreement," and Nissan "ranked dealers based on their RSE scores within a particular state, which allowed [Nissan] to assess how a dealer was performing on a relative basis against an even more localized group of peers."

## 2. Bates' Performance Under the RSE Metric

Here, Bates never reached a cumulative RSE score of 100% at any point from 2007 through August 30, 2013. Bates' RSE scores from 2007 through August 30, 2013, follow:

| YEAR | RSE SCORE |
|------|-----------|
| 2007 | 87.1% |
| 2008 | 74.5% |
| 2009 | 81.0% |
| 2010 | 85.2% |
| 2011 | 90.0% |
| 2012 | 79.8% |
| 2013 | 75.0% |

Throughout this time period, Bates' RSE scores were consistently near the bottom of all Nissan dealerships in Texas. From 2007 through 2012, Bates ranked anywhere from 52nd to 60th out of sixty-three dealerships, and, as of January 2013, Bates was ranked 63rd out of sixty-six Nissan dealers. In fact, "Bates was the lowest-scoring dealer in Texas, based on cumulative RSE percentage, for the time period from 2009 through September 2013." Based on that poor sales record, Nissan's notice of termination alleged that Bates had failed to meet its sales obligations under the Agreement.

In September 2013, Bates' RSE score fell to 70.5%. Bates then hired Kevin Adams to be the new general sales manager. In November 2013, after Adams took over Bates' sales management, Bates' RSE rose to 96.7%, and then it rose to 125% in December. "For the rolling 12-month period ending in November 2014, Bates' RSE score was 102.2%," and between September 2014 and June 2015, Bates maintained an average RSE score of over 100%. Bates argued that its improved RSE scores ameliorated its prior poor RSE performance. Nevertheless,

15

the ALJ rejected that argument because Nissan had given Bates numerous chances to improve its performance.

## C.   Administrative Findings and Conclusions

The ALJ ultimately found that Bates did not fail to perform under the Agreement notwithstanding its poor performance under the RSE metric. The ALJ reached this conclusion because he found that RSE was not a reasonable criterion for evaluating Bates' sales performance as required by Section 3.B of the Agreement.[13] The ALJ explained that while the RSE metric was a "reasonable tool to measure and compare [Nissan's] dealers in regard to their sales," it was "not an appropriate measurement of Bates' contractual obligations under Section 3.A of the Dealer Agreement." The ALJ noted that the sales penetration factor (regional sales average) portion of the RSE equation was "based on all sales (both inside and outside dealers' PMAs) and the RSE method allow[ed] dealers to achieve their RSE goals by sales outside of their PMA." And, Nissan acknowledged that approximately one-half of all new Nissan vehicles sold by Nissan dealers were registered outside the selling dealer's PMA. The ALJ concluded that because the RSE target score was "based on data that include[d] sales outside of their PMAs," RSE was "not reasonably designed to measure Bates' sales obligations in Section 3.A and, thus, [would] not establish a violation of such sales obligation."

The ALJ reasoned that the dealer agreement required "only that Bates focus on customers in its own PMA." Yet, the ALJ found that a dealer's RSE target score was "not really tied to sales

---

[13]The ALJ noted that Nissan's representative, Patrick Steiner, testified in his deposition that Bates had no sales obligations outside of its PMA, and the Board made that finding. The ALJ also noted that Nissan's expert, Sharif Farhat, testified in his deposition that RSE did not fall within any of Section 3.B's examples, and the Board made that finding as well.

within PMA's." In light of the explicit dealer obligation listed in section 3.A, the ALJ evaluated Bates' sales performance based on its sales within its PMA. The ALJ found that Bates' sales effectiveness within its PMA was about average. The Board found that "[i]n 2012 and 2013, Bates obtained approximately 71% of all new retail Nissan car and light truck sales in its PMA, losing only 29% of Nissan sales to dealers outside its PMA, while the average Nissan sales percentage for a Texas dealer over that time period was 58%," meaning that "the average Texas Nissan dealer lost 42% of Nissan sales in its PMA to other Nissan dealers." Thus, Bates' PMA sales put it "in the top one-third to one-half of all Nissan dealers in Texas during 2012 and 2013" in terms of how effectively Nissan dealers captured Nissan sales within their PMA.

Finally, the ALJ noted that in 2012, Bates obtained almost 69% of its RSE target score through sales within its PMA, which was better than the overall weighted average of Texas Nissan dealer's PMA sales percentage, 65.42%, and higher than the median. For the twelve-month period from October 2012, through September 2013, Bates' percentage of its target RSE obtained from within its PMA was equal or superior to the two nearest Nissan dealerships, Temple and Waco, and was slightly below the overall weighted average, "but still in the top half of all Nissan dealers in Texas." Over the same time period, only seven of twenty-six single-point Texas Nissan dealers reached 100% of their target RSE through sales in their PMAs, with Bates being one of the nineteen such dealerships that failed to do so. Based on these findings, the Board ultimately found that "Bates did not fail to fulfill its Sales Obligation under the Dealer Agreement" and concluded that Nissan failed to establish that Bates had "materially breached any of its obligations under the . . . agreement."

17

### D.     Summary of the Board's Decision and Nissan's Argument

To begin with, we highlight four principles of the Board's ruling that are pertinent to Nissan's argument.  First, Nissan bears the burden of establishing good cause to terminate the dealer agreement.  Second, in determining whether good cause has been established, the Board considers the seven statutory factors set forth in Section 2301.455, subsections (a)(1)–(7).  TEX. OCC. CODE ANN. § 2301.455(a)(1)–(7).  Third, the sixth statutory factor requires the Board to consider "the parties' compliance with the [Agreement], except to the extent that the [Agreement] conflicts with [the statute]. . . ."  TEX. OCC. CODE ANN. § 2301.455(a)(6).  And fourth, the Board found that Bates did not fail to comply with the Agreement.

With these principles in mind, Nissan argues that the Board erred in finding that Bates did not fail to comply with the Agreement.  Nissan argues that the unambiguous contract allowed it to use RSE to evaluate Bates' performance and, because Bates failed to perform under that metric, Bates failed to comply with the Agreement.  Nissan further argues that the question of whether Bates complied with the Agreement is a question of law, that the Board's error is therefore an error of law, and that it was substantially prejudiced by the Board's error of law.  Accordingly, Nissan asks this Court to (1) find that the Board erred as a matter of law in finding that Bates did not fail to comply with the Agreement, (2) reverse the Board's determination on that statutory factor and hold as a matter of law that Bates failed to comply with the Agreement, and (3) remand the case to the Board with instructions to reweigh the statutory factors in light of our holding that Bates failed to comply with the Agreement as a matter of law.  *See* TEX. GOV'T CODE ANN. § 2001.174(2) ("a court . . . (2) shall reverse or remand the case for further proceedings if

18

substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: . . . (D) affected by other error of law").

### 1. The Issue of Whether RSE Is a Reasonable Criterion Under Section 3.B Is a Fact Question

Because RSE is not listed as an example in Section 3.B of the Agreement, and because Nissan based its notice of termination on the undisputed fact that Bates failed to meet RSE target scores, resolution of Nissan's argument turns on whether RSE is a reasonable criterion under Section 3.B for evaluating Bates' compliance with its obligations under Section 3.A. However, because it determines the standard of review we are to apply in this case, we must first address whether this issue is a question of law or a question of fact.

Nissan argues that the issue before us is a question of law because it involves the interpretation of an unambiguous contract. Specifically, Nissan argues that "under the plain language" of Section 3.B, "the legal question presented to the Board—and that is now presented to this Court on *de novo* review—is narrow and straightforward: does RSE constitute 'reasonable criteria' that Nissan may use to evaluate a dealer's sales performance under the Dealer Agreement?" Because it believes this is a legal question, Nissan argues that we are to review the Board's decision de novo, which means we are to give no deference to either the Board's or the trial court's decision.

Our research has yielded no Texas case on point. However, Section 3.B of the Agreement provides that Nissan "will evaluate [Bates'] performance of its sales responsibility . . . on the basis of reasonable criteria as [Nissan] may develop from time to time." The definition of the word reasonable suggests that this provision creates a fact question because it requires a comparison to

19

surrounding circumstances: "**reasonable**, *adj*. 1. Fair, proper, or moderate under the circumstances; sensible <reasonable pay>." *Reasonable*, BLACK'S LAW DICTIONARY (11th ed. 2019). In addition, the interjection of the term "reasonable" into a contract virtually always creates a question of fact. For example, in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, the Supreme Court held that a contractual attorney-fee shifting provision stating that "the prevailing party shall be entitled to an award for its reasonable attorneys' fees" created a fact question. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488–89 (Tex. 2019) (stating that both reasonableness and necessity "are questions of fact to be determined by the fact finder and act as limits on the amount of fees that a prevailing party can shift to the non-prevailing party").[14]

It is true that Texas courts have held that when the facts are undisputed and "only one reasonable inference can be drawn from the evidence," the issue becomes a question of law. *State*

---

[14]Texas courts have treated contractual provisions requiring reasonable actions as a fact question in other contexts as well. For instance, where a plaintiff seeks recovery under an insurance policy providing payment for "reasonable and necessary medical expenses," the courts have applied the legal sufficiency standard of review which evaluates the quantity and quality of the evidence before the trial court to determine whether it supports the jury's (or the trial court's in a non-jury trial) findings of fact. *See Am. Cent. Ins. Co. v. Melton*, 389 S.W.2d 177, 181 (Tex. App.—Dallas 1965, writ ref'd n.r.e.) (holding that evidence was legally insufficient to prove reasonableness of medical expenses for recovery under insurance policy requiring insurer "[t]o pay all reasonable expenses incurred within one year from the date of the accident for necessary medical . . . services"); *Minsky v. Hardware Mut. Cas. Co.*, 358 S.W.2d 664, 668 (Tex. App.—Waco 1962, writ ref'd n.r.e.) (holding that "appellee's general denial placed upon appellant the burden of proving all the facts necessary in support of recovery" on his "suit to collect under a contract of insurance . . . for reasonable expenses which were necessarily incurred for injuries caused by an automobile accident"). Likewise, when Texas courts imply a reasonable term of performance into a contract, that implied term creates a question of fact. *Hall v. Hall*, 308 S.W.2d 12, 16–17 (Tex. 1957) (holding that "[w]hen the parties omit an express stipulation as to time, . . . [we] assume that they meant whatever term of days or years might be reasonable in the light of the circumstances before them at the date of the contract" and that "such determination is usually 'a question of fact' and is almost always made well after the date of the contract . . . ."). Moreover, courts have held that a declaratory judgment "is not the proper vehicle" for "resolving what rates a hospital may charge patients," "because the question would require the resolution of a factual dispute by competent evidence." *Shahin v. Mem'l Hermann Health Sys.*, 527 S.W.3d 484, 491 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding that "[w]hether or not the rate a hospital may charge patients is reasonable is a question of fact").

*Farm Cty. Mut. Ins. Co. v. Plunk*, 491 S.W.2d 728, 731 (Tex. App.—Dallas 1973, no writ) (citing

*Klein v. Century Lloyds*, 275 S.W.2d 95, 97 (Tex. 1955) (holding that policy holder failed to give

reasonable notice to the insurer of a claim against him as a matter of law where he waited thirty-

two days to give notice because the insured did not testify and there was no evidence he was unable

to give notice due to physical or mental disability)); *see also WesternGeco, LLC v. Input/Output,*

*Inc.*, 246 S.W.3d 776, 785 n.6 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that trial

court erred in ruling as a matter of law that any implied reasonable time for performance had

already expired was error because "if a reasonable time is implied, the determination of what is a

reasonable time is generally a question of fact that is based on the circumstances surrounding the

adoption of the agreement, the situation of the parties when they entered into the agreement, and

the subject matter of the agreement," but also noting that "summary judgment would be possible

if the evidence is uncontroverted regarding these matters").        However, other courts have

held that only when the conduct is so unreasonable that no reasonable person would have engaged

in that action can it be said that there is only one reasonable inference to be drawn from the

undisputed facts. *See Onwukwe v. Ike*, 137 S.W.3d 159, 164 (Tex. App.—Houston [1st Dist.]

2004, no pet.) (holding that "[t]he standard of care applied to a defendant who fails to timely

answer a lawsuit is such as prudent and careful persons would ordinarily use in their own cases of

equal importance" and, therefore, "unless an act is negligence per se or is so opposed to the dictates

of common prudence that we can say, without hesitation or doubt, that no careful person would

have committed it, the question of negligence is one for the trier of fact"); *Lang v. Henderson*, 215

S.W.2d 585, 587 (Tex. 1948) (holding that "in order that an act shall be deemed negligent per se,

21

it must have been done contrary to a statutory duty, or it must appear so opposed to the dictates of common prudence that we can say, without hesitation or doubt, that no careful person would have committed it"); *see also Beaumont S.L.&W. R.R. Co. v. Sterling*, 260 S.W. 320 (Tex. App.—Beaumont 1924, writ dism'd w.o.j.) (holding that whether reasonableness is a question of law turns on whether the action "appear[s] so opposed to the dictates of common prudence as that all reasonable minds would, without hesitation or doubt, conclude that no careful person would have committed it").[15]

In this case, the language of the Agreement, the method by which RSE is calculated, Bates' performance under RSE, and Bates' sales performance within the PMA are undisputed. On the other hand, even though the conditions upon which reasonableness must be compared are undisputed, we do not find that every objectively reasonable seller in Nissan's position would always use RSE under the undisputed circumstances in this case. Therefore, we find that this issue

---

[15]While this caselaw discusses the issue in terms of a deviation from ordinary care, logically, the reverse is also true, namely, only when it can be said that no reasonable person would fail to engage in the conduct at issue can it be said that the issue is a question of law.

is a question of fact.[16] Because this is a question of fact, we apply the substantial evidence standard of review.[17]

### 2.    Analysis

The substantial-evidence standard is a limited standard of review requiring only more than a mere scintilla to support an agency's finding or determination. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 566 (Tex. 2000) (citing *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995)). More than a scintilla of evidence to support a finding exists if

---

[16]There is another reason why this appears to be a fact question. As noted, the Agreement does not state any specific sales requirement in terms of number of vehicles sold or a percentage of the market share; instead, Section 3.B provides that "[Bates'] performance of its sales responsibility for Nissan Cars and Trucks will be evaluated by [Nissan] on the basis of such reasonable criteria as [Nissan] may develop from time to time. . . ." This section gives Nissan sole discretion to determine the standard by which Bates' performance will be evaluated. Accordingly, the Agreement essentially "places the final decision regarding adequacy of [Bates'] performance in [Nissan's] hands." *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 88 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 681, 690 (Tex. 1989). In such contracts, "most courts apply an objective good faith test in determining whether the party with discretion to determine compliance acted in good faith" rather than invalidate such agreements as "illusory because conditioned upon the whim or caprice of the party to be satisfied." *Id*. at 88–89. Accordingly, in such contracts, "[t]he general rule . . . is that the judgment of the party regarding adequacy of performance will be upheld if made in good faith." *Id*. at 88. This good-faith requirement is a reasonableness standard. *Id*. at 89 ("We adopt the reasonableness test in the instant case for determining whether to uphold the decision of Black Lake's inspectors.").

[17]As noted above, Nissan argues that this is a question of law. It further argues that Sections 3.A and 3.B should be read together, but in the event of a conflict between them, the specific Section 3.B governs over the general Section 3.A. Nissan goes on to argue that because Section 3.B permits it to use RSE, RSE supersedes Bates' PMA obligations under Section 3.A as a matter of law. However, Nissan's argument only works if we presuppose that RSE is a reasonable criterion under Section 3.B. In other words, Nissan starts with the conclusion that RSE is a reasonable criterion under Section 3.B and then argues that because Section 3.B allows Nissan to use reasonable criteria in evaluating Bates' performance under Section 3.A, the unambiguous contract allows the application of RSE to measure Bates' Section 3.A obligations as a matter of law.

Yet, whether RSE is a reasonable criterion under Section 3.B is the very issue for decision in this case. Nissan would have us assume the answer to the question before we ask it and then, based on this assumption, conclude that we are presented with a question of law that must be resolved in Nissan's favor. In reality, however, we are not presented with a question of contract interpretation regarding Sections 3.A and 3.B. Rather, we are presented with the fact question of whether RSE is reasonable under the circumstances, and Sections 3.A and 3.B are some of the circumstances against which RSE must be measured. For the reasons cited herein, we agree with the Board that RSE is not a reasonable criterion under Section 3.B under the circumstances in this case.

the evidence would allow reasonable and fair-minded people to differ in their conclusions concerning the finding. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). Whether substantial evidence supports an administrative finding is a question of law. *Davis*, 34 S.W.3d at 566.

The Board found that Section 3.A did not obligate Bates to sell outside of its PMA, a fact supported by the testimony of Nissan's own corporate representative. The ALJ determined that RSE was not "reasonably designed to measure Bates's sales obligations in Section 3.A," noting that it was undisputed that the RSE target scores were based on data that included sales outside of the dealer's PMA. In light of these findings and the agreement's language, the Board evaluated Bates' sales performance based on its sales within its PMA, a methodology "based on the evidence presented during the hearing process."[18] The Board found that Bates' sales within its PMA were average among Texas Nissan dealers. Based on those findings, the Board determined that Bates did not fail to fulfill its obligations under Section 3.A of the agreement. Nissan does not challenge these findings, and "when a court's findings of fact go unchallenged, such findings become undisputed facts binding on all parties." *Des Champ v. Featherston*, 886 S.W.2d 536, 541–42 (Tex. App.—Austin 1994, no writ). Therefore, the Board's conclusion that Bates did not violate the Agreement is supported by substantial evidence.[19]

---

[18]During the hearing process, the Board is free to determine that "[one party] had the more convincing experts and appropriate methodology to evaluate the statutory good cause factors." *Austin Chevrolet, Inc.*, 212 S.W.3d at 437–38.

[19]In its brief and at oral argument, Nissan argued that to the extent this is a fact question, the Board found that RSE was a reasonable criterion: "Importantly, the *Board itself* found RSE to be a reasonable criterion for measuring its

**3.    The Agreement Requires More Than a Failure to Perform Under Section 3.B's Reasonable Criteria in Order to Allow for Termination of the Dealer Agreement.**

Finally, we note that even if it could be said that the issue before us was a question of law and that the Board erroneously concluded that RSE was not a reasonable criterion under Section 3.B, as a matter of law—and even though it is undisputed that for the years 2007–2013, Bates performed poorly under the RSE metric—nothing in the dealer agreement provides that the failure to adequately perform under Section 3.B's reasonable criteria is, by itself, grounds for termination of the contract. Rather, Section 12.B.1.a states,

> Termination by Seller for Non-Performance by Dealer. (1) If, based upon the evaluations therefor made by Seller, Dealer shall fail to substantially fulfill its responsibilities with respect to: (a) Sales of new Nissan Vehicles and the other responsibilities of Dealer set forth in Section 3 of this Agreement . . . Seller will notify Dealer of such failure and will review with Dealer the nature and extent of such failure and the reasons which, in Seller's or Dealer's opinion, account for such failure. Thereafter, Seller will provide Dealer with a reasonable opportunity to correct the failure. If Dealer fails to make substantial progress towards remedying such failure before the expiration of such period, Seller may terminate this Agreement by giving Dealer notice of termination . . . .

(emphasis added).

The sale of new cars is but one of the responsibilities of Section 3. Section 3 also requires Bates to (1) "engage in used motor vehicle operations as and to the extent reasonably required for Dealer to effectively perform its responsibilities for the sale of Nissan Vehicles," (2) "organize

---

dealers' sales performance." Yet, the full context of the ALJ's statement—as adopted by the Board—does not support Nissan's argument. Rather, the complete statement from the ALJ on this topic is as follows: "Although the ALJ generally finds RSE to be a reasonable tool to measure and compare NNAs dealers in regard to their sales, and concludes that Bates did perform poorly by RSE standards up until November 2013, *the RSE is not a useful tool for measuring Bates' performance under its contractual obligations* for reasons explained below." (Emphasis added). Thus, neither the ALJ nor the Board found that RSE was a reasonable criterion for measuring Bates' performance in this case.

25

and maintain a sales organization that includes a sufficient number of qualified and trained sales managers and sales people to enable Dealer to effectively fulfill its responsibilities under this Section 3," and (3) "have members of Dealer's sales organization attend . . . training courses [offered by Nissan] and Dealer shall cooperate in such courses." Nissan did not present any evidence to establish that Bates failed to substantially fulfill its other requirements under Section 3, only that it failed to comply with RSE. On this basis, the Board could have determined that Nissan failed to establish that Bates failed to comply with the dealer agreement in a manner that justified termination under the agreement's terms. Accordingly, the Board did not err in concluding that Nissan failed to establish that Bates failed to reach its sales obligations under the agreement, and we overrule this point of error.[20]

---

[20]Nissan argues that in *Cecil Atkission Orange, LLC v. FCA US*, an administrative case decided shortly after this one, the Board sanctioned the use of Minimum Sales Responsibility (MSR), a sales performance measure very similar to RSE, and did so "based on virtually the same contract language." *Cecil Atkission Orange, LLC v. FCA US*, No. 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, 2016 WL 3457922, at *40 (TSOAH 2016). In *Atkission*, the Board determined that MSR was a reasonable and appropriate measure for evaluating the first good-cause factor, sales in relation to sales in the market. *Id*. However, the agreement in *Atkission* explicitly informed *Atkission* that it would have to sell enough vehicles "to fulfill Dealer's Minimum Sales Responsibility," whereas here, the agreement does not list RSE as an evaluation method. *Id*. at *8. Also, Atkission "did not dispute MSR as a reasonable method to evaluate sales" under the agreement, but in this case, Bates challenged whether RSE was a reasonable criterion. *Id*. at *9. Furthermore, in *Atkission*, the ALJ found that Atkission's sales performance inside and outside its contractual "Sales Locality" was consistently poor and declining, rendering the dealer "the worst of all Chrysler dealers in Texas in regard to its sales," but here, the Board determined that Bates' sales within its PMA was about average among Texas Nissan dealers. Therefore, the facts of *Atkission* are distinguishable from this case.

Nissan also cites to cases from Wisconsin, Florida, Ohio, Michigan, New Hampshire, and California, arguing that other jurisdictions have held that the agreement permits the use of RSE as a reasonable criterion for evaluating a dealer's performance. Though we can look to other jurisdictions for guidance, the courts of Texas are not bound by a foreign court's construction of a contract or factual findings. See *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 295–97 (Tex. 1993) (holding that Texas courts are only obligated to follow decisions by higher Texas courts and the United States Supreme Court).

**IV.    Did the Board Err in Concluding that Bates' Accounting Practices Did Not Breach the Agreement?**

In its second point of error, Nissan contends (1) that the Board erred as a matter of law in concluding that Bates' accounting practices did not breach Sections 12.A.9 and 12.A.10 of the Agreement because Bates willfully falsified its tax returns and knowingly submitted false financial statements to Nissan and (2) that those errors of law impacted the Board's analysis of the sixth good-cause factor. *See* TEX. OCC. CODE ANN. § 2301.455(a)(6).

**A.    Did Bates Knowingly File Falsified Tax Returns to the IRS?**

**1.    Background**

Bobby Bates, seeking to lower Bates' annual taxable income to $75,000.00, asked the company's tax preparer if the company could adjust, or "write-down," the value of its vehicle inventory based on the Lower of Cost or Market (LCM) accounting methodology. The preparer told him that he did not know of any reason why Bates could not do so. Thus, between 2009 and 2013, Bates annually adjusted the value of its vehicle inventory on its thirteenth-month financial statements, creating the appearance of a loss on the vehicles and lowering Bates' taxable income. The next year, when the vehicles were sold, Bates would recapture the write-down as additional profit.

On February 13, 2015, after having received Nissan's amended notice of termination alleging that Bates' accounting practices violated the agreement, Bates notified the IRS that it had improperly used the LCM accounting practice and proposed to correct the improperly taken write-downs and pay, over the ensuing four tax periods, the appropriate back taxes that would have been due had the LCM accounting method been applied properly. The IRS accepted Bates' proposal,

took no enforcement action against it, and filed no criminal or civil charges regarding the returns. The Board found that the write-downs "did not have a justified factual basis and were improper" because Bates did not follow accepted accounting principles in determining the inventory write-downs. However, the Board also found that "[a]t the time he made the LCM adjustments, Bobby Bates believed his actions [on behalf of the company] were proper" and that "[t]he evidence does not demonstrate that Bates willfully failed to comply with any laws or regulations, including any tax laws or regulations."

### 2. Nissan's Argument

Section 12.A.9 of the Agreement provides that Nissan may terminate the agreement for

> any willful failure of Dealer to comply with the provisions of any laws, ordinances, rules, regulations, or orders relating to the conduct of its Dealership Operations including, without limitation, the sales and servicing of Nissan Products.

Nissan argues that the Board erred as a matter of law in concluding that Bates did not breach Section 12.A.9 of the Agreement because Bates willfully submitted falsified tax returns. Specifically, Nissan contends that by arbitrarily writing down the value of its vehicle inventory, Bates's tax returns violated 26 U.S.C. Section 7201, concerning an attempt to evade or defeat a tax obligation, and 26 U.S.C. Section 7206, concerning fraud and false statements, as well as Treasury Regulations 26 C.F.R. Sections 1.47-4 and 1.471-2.

Section 7201 pertains to "any person who willfully attempts in any manner to evade or defeat any tax imposed," and Section 7206 is aimed at those who commit fraud or make false statements "willfully . . . with intent to evade or defeat the assessment or collection of any tax imposed." 26 U.S.C. § 7206(1)–(2), (4). The two treasury regulations establish the proper method

28

for valuing inventories and the rules for computing tax credits for investment in depreciable property, such as automobiles.  26 C.F.R. §§ 1.471-2, 1.47-4.  However, Nissan does not cite any source defining willfulness as used in Sections 7201 and 7206; rather, it argues that Bates acted willfully as defined by California law.

Specifically, Nissan notes that section 17.F of the Agreement provides that "[A]ll questions concerning the interpretation . . . of any of [the Agreement's] terms or provisions . . . shall be governed by . . . the . . . laws of the State of California."  Nissan then notes that under California civil law, "willful"

> does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally.  It amounts to nothing more than this:  That the person knows what he is doing, intends to do what he is doing, and is a free agent.

*Ibrahim v. Ford Motor Co.*, 263 Cal. Rptr. 64, 74 (Cal. Ct. App. 1989) (internal quotation marks omitted) (citations omitted); *Baker v. Am. Horticulture Supply, Inc.*, 186 Cal.App.4th 1059, 1074–75 (2010).  Using the California interpretation of "willful," Nissan argues that Bates violated Sections 7201 and 7206 simply by intentionally submitting the tax returns that contained the improper write-downs.  It concludes that it does not matter whether Bates submitted the tax returns with the intent to evade taxes, defraud the IRS, or deceive anyone because the California definition of willfulness does not require such proof.

Nevertheless, the ALJ and the Board found that Texas law applied to this case, and under Texas law, the term "willfully" required proof that Bates acted "with evil intent or legal malice or without reasonable ground believing the act to be lawful."  *See Pretzer v. Motor Vehicle Bd.*, 125

29

S.W.3d 23, 33 (Tex. App.—Austin 2003), *overruled in part on other grounds by Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908 (Tex. 2004); *see also City of Baird v. W. Tex. Utils. Co.*, 145 S.W.2d 965, 968 (Tex. App.—Eastland 1940), *writ dism'd*, 148 S.W.2d 392 (Tex. 1941) (holding that willful in penalty statute means "with evil intent"); *Moore v. Moore*, 142 S.W.2d 270, 272 (Tex. App.—Beaumont 1940, no writ) (holding that willful means "not only with an evil intent and malice but . . . a set purpose and design"). Nissan contends that the Board made an error of law by applying the Texas definition of willful. We disagree.

### 3.    Analysis

Section 2301.478(a) states, "Notwithstanding the terms of any franchise or any other law, . . . the law of this state applies to" any action brought by a manufacturer against a dealer. TEX. OCC. CODE ANN. § 2301.478(a). Therefore, Section 2301.478(a) supersedes any choice of law provision in the dealer agreement, and the Board was free to apply the Texas definition of that term. There is no evidence establishing that Bates acted "with evil intent or legal malice or without reasonable ground believing the act to be lawful." *Pretzer*, 125 S.W.3d at 33. Consequently, the Board did not err in finding that the evidence failed to demonstrate that Bates willfully failed to comply with "any tax laws or regulations."

### B.    Did Bates Provide False or Fraudulent Financial Information to Nissan?

### 1.    Nissan's Argument

Bates prepared a thirteenth-month financial statement that reflected the vehicle write-downs. The ALJ's proposal for decision provided the following example of how the adjustments were made using the thirteenth-month financial statement:

30

if the [thirteenth] month financial statement showed a loss of $5,000 because of a vehicle write-down, but the following year's first month financial statement showed a $10,000 profit on that same vehicle (a true $5,000 profit and an additional $5,000 profit to offset the $5,000 loss taken on the 13th month statement), then one might mistakenly assume that Bates had a profit of $10,000 on the vehicle when in reality, the true profit was half that.

Nissan argues that the Board erred as a matter of law in concluding that Bates did not breach section 12.A.10 of the Agreement because Bates knowingly submitted fraudulent and/or false financial statements to Nissan. Section 12 of the agreement provides that Nissan may terminate the agreement in the event of a "[k]nowing submission by Dealer to Seller of: (i) a false or fraudulent report or statement; . . . (iii) false financial information; [or] (iv) false sales reporting data . . ." Accordingly, Nissan contends that because the thirteenth-month statements were not submitted to Nissan, it did not know of the write-down adjustments and, therefore, "all subsequent financial statement[s] submitted by Bates to Nissan failed to reflect Bates's true financial condition."

### 2. Analysis

The unchallenged findings of fact defeat Nissan's arguments. Nissan's claim that Bates sent it false statements fails because the Board found that there was "no evidence that any financial statements submitted by Bates to [Nissan] were actually false." [21] Nissan's fraud claim also fails. Fraud requires the making of a false statement with intent to induce detrimental reliance resulting

---

[21]It was undisputed that "use of [thirteenth-]month financial statements [was] an accepted practice, and such statements [were] ordinarily prepared for tax purposes." It is also undisputed that Bates did not submit its thirteenth-month financial statements to Nissan. The Board found that memorandums from Nissan "were ambiguous as to whether the thirteenth-month financial statements were to be submitted by dealers to Nissan." Originally, Nissan's corporate representative and long-time employee, Patrick Steiner, testified that Bates was under no contractual obligation to submit the thirteenth-month statements to Nissan. Later, however, after reviewing the agreement, he "modified his testimony."

in injury. Although the Board found that "Bates' failure to send the 13th month financial statement to [Nissan] could have created a skewed picture of Bates' capitalization and profitability in Nissan's eyes," it also found that the evidence failed to show that "Bates acted with any intent to defraud or mislead Nissan" or that Nissan relied, to its detriment, on Bates' financial statements. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011). Therefore, the Board did not err in concluding that Bates' accounting practices breached the Agreement. Accordingly, we overrule this point of error.

## V.     Did the Board Err in Considering Evidence of Bates' Sales Performance After the Notice of Termination Was Sent?

The Board's findings of fact also included the following findings regarding Bates' sales performance after the notice of termination was issued:

59.     Beginning in November 2013, Bates' sales performance dramatically improved when it hired Kevin Adams to be the new general sales manager.

60.     In September 2013, immediately prior to hiring Mr. Adams, Bates had been at 70.5% RSE.

61.     After hiring Mr. Adams, Bates went to 96.7% RSE in November 2013, and then to 125% RSE in December 2013, the same month the [notice of termination] was issued.

62.     For the rolling 12-month period ending in November 2014, Bates' RSE score was 102.2%.

In its final point of error, Nissan contends that the Board erred in considering evidence of events that occurred after Nissan issued its notice of termination in December 2013 and that reversal is necessary even if the Board properly considered the post-notice evidence.

32

### A.  Did Nissan Preserve this Issue for Appeal?

Initially, Bates and the Board contend that Nissan failed to preserve this point of error because it failed to specifically challenge the findings of fact relating to Bates' sales performance after Nissan issued the notice of termination.  We disagree.

In order to appeal from the Board's decision, Nissan was required to file a motion for rehearing.  TEX. GOV'T CODE ANN. § 2001.145.  The motion for rehearing had to "identify with particularity findings of fact or conclusions of law that are the subject of the complaint and any evidentiary or legal ruling claimed to be erroneous.  The motion . . . also [had to] state the legal and factual basis for the claimed error."  TEX. GOV'T CODE ANN. § 2001.146(g) (Supp.).

Here, Nissan's motion for rehearing did not challenge the four findings of fact, but it did challenge the Board's legal conclusion that it could consider Bates' post-notice sales performance.  The motion argued that the proposal for decision "incorrectly conclude[d] that all existing circumstances [under Section 2301.455(a)] include[d] all information available to the Board at the time it ma[de] it[s] decision."  The motion cited the appropriate pages from the ALJ's proposal where the conclusion was made as well as supporting legal argument.  Because Nissan is challenging a conclusion of law that was raised in its motion for rehearing, this point of error was preserved for our review.

### B.  Did the Board Err in Construing the Statute?

Section 2301.455(a) of the Texas Occupations Code provides that notwithstanding the terms of any franchise agreement, in making the good-cause determination, the Board "shall

consider all existing circumstances," including the seven enumerated factors. TEX. OCC. CODE ANN. § 2301.455(a). Based on that language, the ALJ concluded,

> [T]he Board should make its determination based on all of the evidence in the record, and this includes any information that bears on the dealership's performance at any time, including after the notice of termination has issued . . . . The statute does not set out a specific time period to consider, but requires the Board to consider "all *existing* circumstances." Given this language, the ALJ does not find the inquiry is limited to the information available to [Nissan] or to the time period prior to the notice of termination. Rather, the inquiry should include all information available to the Board at the time it makes a final decision . . . ,[thereby] giving the Board a better factual basis from which to make a decision.

Because Section 2001.141(c) of the Texas Government Code requires that findings of fact be based upon evidence in the record or matters officially noticed, the ALJ determined that "the close of the evidentiary record serves as the natural end point for the relevant time period" and that, therefore, it could consider evidence of Bates' post-notice sales performance. TEX. GOV'T CODE ANN. § 2001.141(c). The Board adopted the ALJ's determination by considering and adopting the four findings of fact regarding Bates' post-notice sales performance.

While most issues in the judicial review of an administrative agency's decision are reviewed under the substantial evidence standard, statutory construction is generally a question of law that is reviewed de novo. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000); *El Paso Nat. Gas Co. v. Cinco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999). "[I]t is cardinal law in Texas that a court construes a statute, first, by looking to the plain and common meaning of the statute's words." *Houston Mun. Emp. Pension Sys. v. Abbott*, 192 S.W.3d 862, 864 (Tex. App.—Texarkana 2006, pet. denied). "If the meaning of the statutory language is

34

unambiguous, we adopt, with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms." *Id.*

An "agency's construction of a statute that it is charged with enforcing is entitled 'to serious consideration by reviewing courts, so long as that construction is reasonable and does not contradict the plain language of the statute.'" *Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 719 (Tex. App.—Austin 2008, pet. denied) (quoting *Emps. Ret. Sys. v. Jones*, 58 S.W.3d 148, 151 (Tex. App.—Austin 2001, no pet.)). An agency's reasonable construction "is entitled to great weight." *Osterberg v. Peca*, 12 S.W.3d 31, 51 (Tex. 2000). However, courts may give less deference to an agency's reading of a statute when legislative intent is at issue rather than the application of technical or regulatory matters within the agency's expertise. *Flores v. Emps. Ret. Sys. of Tex.*, 74 S.W.3d 532, 545–46 (Tex. App.—Austin 2002, pet. denied).

Nissan contends that the Board should have only considered the "circumstances that existed at the time Nissan issued its Notices of Termination in this Case." Nissan argues that the phrase "all existing circumstances" must be read in conjunction with Section 2301.453(g) of the Texas Occupations Code, which states that "[a]fter a hearing, the board shall determine whether the party seeking the termination or discontinuance has established by a preponderance of the evidence that there is good cause for the proposed termination or discontinuance." TEX. OCC. CODE ANN. § 2301.453(g). Nissan argues that because it "cannot be expected to predict the future," it can only seek termination "based on the information available to it at the time" it issues the notice and that, therefore, the Board should only consider that same information.

35

However, the language of the statute does not limit "all existing circumstances" to those circumstances existing at the time of or prior to the notice of termination. Nissan has failed to cite caselaw finding such a limitation, and we are aware of none. *See* TEX. OCC. CODE ANN. § 2301.455(a). On the contrary, Texas cases considering "all existing circumstances" support the Board's interpretation of the phrase in this case.

In *Ford Motor Co. v. Motor Vehicle Board*, the Board found, in part, that the manufacturer had shown good cause to terminate the franchise agreement with the dealer, and the dealer sought judicial review, arguing, in part, that the Board "abused its discretion by ordering termination for good cause in the absence of evidence that [the dealer] may not perform well as a dealer in the future." *Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 758 (Tex. App.—Austin 2000, pet. denied). The Austin Court of Appeals affirmed the termination, finding that a consideration of "existing circumstances" included an evaluation of "the dealer's past and current performance with regard to sales, service, warranties, and compliance with franchise agreements," but did not include "a speculative evaluation of what kind of relationship a manufacturer and dealer might have in the future." *Id.* at 759 (emphasis added) (interpreting "existing circumstances" under Section 2301.455(a)'s statutory predecessor). The court noted that even if the term contained "an element of prognostication," the dealer's argument still failed because the undisputed facts established that the dealer had a pattern of abusing the manufacturer's dealer programs and intentionally deceiving the manufacturer. *Id.*

In *Sweeten Truck Center, L.C. v. Volvo Trucks, North America*, the agreement between Volvo and its dealer, Sweeten, designated twenty-four counties as Sweeten's geographic area of

responsibility (AOR). In September 2013, Volvo gave notice that it intended to remove several counties from Sweeten's AOR, and Sweeten filed a protest with the TDMV. *Sweeten Truck Ctr., L.C. v. Volvo Trucks, N.Am.*, No. 03-16-00068-CV, 2016 WL 4979826, at *1 (Tex. App.—Austin Sept. 13, 2016, no pet.) (mem. op.). The ALJ conducted a six-day, contested hearing, considered evidence of Sweeten's performance from the periods both before and after the notice, closed the evidentiary record in December 2014, and issued a proposal for decision recommending that the Board approve Volvo's proposed modification. *Id.* When the Board adopted the ALJ's proposal and approved the modification, Sweeten sought judicial review. *Id.*

On appeal, Sweeten argued, in part, that the phrase "all existing circumstances" meant that the Board had to give greater weight to "currently existing circumstances" and that the Board prejudiced its substantial rights by placing greater weight on its past sales and service performance from the pre-notice years 2009 through 2013, as opposed to its most recent, post-notice performance evidence from 2014. *Id.* at *2. The Austin Court of Appeals noted that the consideration of several of the good-cause factors, including sales in relation to sales in the market, would necessarily require a compilation of data likely spanning years and that the Board had properly considered both the historical data and the most recent data. *Id.* The court stated that if it were to adopt Sweeten's interpretation, a dealer could nearly always avoid a franchise modification by making improvements only after receiving notice from the manufacturer. *Id.* at *3.

The Austin court stated, "In addition, even if we were to accept Sweeten's statutory construction, Sweeten has not shown that the Board failed to consider the recent data, only that the

37

Board did not view the most recent data as conclusive" or give it the appropriate weight. *Id.* Finding that the Board had not misinterpreted "all existing circumstances," the court affirmed the Board's decision because the Board had properly considered both the historical and most recent data, and the weight to be given to that evidence was "a matter solely within the province of the Board." *Id.* at 2–3 (citing TEX. GOV'T CODE ANN. § 2001.174 ("a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion")).

Nissan argues that if the Board is permitted to consider a dealer's post-notice performance, it would invoke the very statutory interpretation rejected by the court in *Sweeten*. However, Nissan misunderstands the holding in *Sweeten*. *See Sweeten*, 2016 WL 4979826, at *2–3. In *Sweeten*, the court rejected the statutory interpretation that the most recent evidence had to be given greater or conclusive weight, an argument that is not present in this case. *Id*. Here, as in *Sweeten*, the Board considered evidence of the dealer's post-notice performance, and it was entirely up to the Board how much weight to give that evidence. *Id.* at *1.

In this case, the Board's interpretation of the phrase "all existing circumstances" comports with the plain language of the statute and does not contradict the legislative intent. *See* TEX. OCC. CODE ANN. § 2301.455(a). Therefore, we must give "great weight" to the Board's construction of "all existing circumstances" and find that the Board did not err in considering Bates' post-notice sales performance. *See Osterberg*, 12 S.W.3d at 51.

**C.      Is Reversal Necessary Even if the Board's Statutory Construction is Correct?**

Nissan contends that even if the Board properly considered Bates' post-notice sales performance, the Board's decision must be reversed because the ALJ's proposal for decision "makes clear that any 'improved' performance by Bates cannot excuse its years of poor performance." Specifically, Nissan argues that the following two sentences in the proposal require this Court to reverse the Board's decision:

> That a dealership may have improved its performance and met standards after being given notice of intended termination should not excuse many years of past poor performance by the dealership.
>
> . . . .
>
> [T]he ALJ disagrees that Bates' improved performance, beginning in November 2013, ameliorated its prior poor RSE performance.

However, when the sentences are read in context, it is clear that they do not mean what Nissan argues they mean.

The first sentence, italicized below, was made in a discussion of "the relevant time period"—whether the ALJ would consider evidence of Bates' post-notice sales performance:

> In considering all relevant information, though, the ALJ does not believe that more recent performance information is necessarily entitled to more weight. Instead, it is simply additional information for the Board to consider when evaluating all circumstances. *That a dealership may have improved its performance and met standards after being given notice of intended termination should not excuse many years of past poor performance by the dealership.* While the Board may consider such improved performance, such consideration would not necessarily preclude good cause for termination or modification of the franchise. Rather, all existing circumstances should be considered—and those existing circumstances include the dealership's sales and service history before any recent performance improvements. Therefore, the ALJ makes his recommendation based upon all of the existing information and circumstances as demonstrated in the evidentiary record.

39

When the sentence is read in context, it is clear that the ALJ's meaning was that the Board could consider Bates' improved, post-notice sales performance, but that it would not necessarily preclude a finding of good cause for termination because the recent performance would not necessarily be given greater or conclusive weight than its performance in the past. As stated hereinabove, that rationale and ultimate determination is supported by Texas caselaw. *See Sweeten*, 2016 WL 4979826, at *2–3.

The second statement, italicized below, occurred near the end of the ALJ's analysis of RSE and states, in full:

> As a final note in this section, *the ALJ disagrees that Bates' improved performance*, *beginning in November 2013*, *ameliorated its prior poor RSE performance.* NNA had given it numerous chances to improve its performance and, at the time NNA issued the NOT in December 2013, the most updated information available showed Bates to still be poorly performing under the RSE methodology. Thus, Bates had not cured its poor RSE performance at the time the NOT issued in December 2013. Although the ALJ concludes that RSE performance is not an appropriate measurement of Bates' contractual obligations under Section 3.A of the Dealer Agreement and thus Bates' improved performance is inconsequential in this section--the RSE performance (including Bates' improvement) is a factor the Board may consider in determining all existing circumstances in this case. But, the ALJ finds it is not a basis for concluding that Bates either violated or cured a contractual violation of Section 3.A of the Dealer Agreement. Now, the ALJ turns to the other justification for termination proffered by NNA.

The sentence was a response to Bates' argument to the ALJ that its "improved performance, which began before the [notice of termination] was issued, cured any deficiencies in its prior performance and should prevent the franchise from being terminated." Furthermore, the context of the sentence makes clear that, while the Board could consider the improved sales, Bates' improved RSE scores were irrelevant because RSE was not an appropriate measure of whether

40

Bates had met his contractual obligations.  Therefore, neither of the statements evidence an error of law or fact.  Accordingly, we overrule this point of error and affirm the trial court's order.

## VI.    Conclusion

For all of the foregoing reasons, we affirm the trial court's judgment.


Ralph K. Burgess
Justice


Date Submitted:      September 6, 2019
Date Decided:        November 22, 2019

41